# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

|  |  |  |
|---|---|---|
| LEO A. ARCHULETA &<br>VIOLA E. ARCHULETA,<br>　　　Plaintiffs, | : | |
| | : | |
| | : | No. 2:12 CV 000703 |
| 　　　vs. | : | |
| CITY OF SOUTH SALT LAKE &<br>UNIFIED POLICE DEPARTMENT, *et al.*,<br>　　　Defendants. | : | Report of Kenneth R. Wallentine |
| | : | |

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

> Plaintiffs' Complaint
>
> Unified Police Department Report and supplements
>
> South Salt Lake City Police Department Report and supplements
>
> Deposition of Luis Lovato
>
> Deposition of Leo Archuleta
>
> South Salt City Police Detective Darren Carr interview
>
> Miscellaneous photographs relating to incident

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows. My opinions are based on information currently available to me, within a reasonable degree of professional certainty, and are subject to amendment and supplementation upon receipt of additional information. I have provided a synopsis of events based on the documents, pleadings, records, reports, and statements provided to me to help explain the circumstances and environment of the incident.

**Incident synopsis:**

Robert Maestas raped L.C., a female juvenile. While L.C. and her family were homeless, she temporarily resided in a residence shared by Maestas and others. Even though she was fearful of retribution, L.C. reported the sexual assaults to a school counselor. L.C. knew that Maestas was a member of a criminal street gang. Maestas also sexually assaulted his own sister, a juvenile, over the course of several years. The sister disclosed repeated sexual assaults when interviewed by a South Salt Lake City Police Department detective and a social service worker.

South Salt Lake Police Department Detective Darren Carr spoke with Maestas's mother, Margaret Maestas. Margaret Maestas told Detective Carr that she knew that Maestas had sexually assaulted a nephew and her daughter prior to assaulting L.C. She told Detective Carr

that Maestas was likely staying at plaintiffs' residence at 3555 South 1300 East in Salt Lake County, where she had seen him just a few hours prior to speaking with Detective Carr. Margaret Maestas told Detective Carr several things that significantly raised Detective Carr's concern about apprehending Maestas. She told him that Maestas believed that he would be killed in prison because of the sex crimes that he had committed. She also said that other persons who had been in prison and were gang members were often present at the residence where Maestas was staying. She related her belief that others were helping Maestas to flee from the state of Utah. Detective Carr knew, through researching Maestas's criminal history, that he was known to associate with a criminal street gang. Margaret Maestas also told Detective Carr that Maestas had been known to carry a gun and that he would fight officers.

Officers went to the residence at 3555 South 1300 East and knocked on the front door. The officers could see Viola Archuleta through a window. She was speaking on a telephone and looking at the officers. She did not respond to the officers' knocking on the door and on the window until after protracted knocking and shouting.

Viola Archuleta then went to the door and spoke with the officers. She told South Salt Lake City Police Officer Studstrup that she did not know Robert Maestas, though she knew that he was then hiding in the residence. Maestas is Viola Archuleta's nephew. She told officers that the upper portion of the residence was not connected to her main floor residence. That also turned out to be a lie. Viola Archuleta told officers that Robert Maestas was not in the residence. Shortly thereafter, a man came out of the basement apartment. Officers confirmed that he was not Maestas.

Other officers arrived and conferred with Detective Carr, confirming for him that Viola Archuleta knew Maestas and that he was staying at the residence. Detective Carr arrested Viola Archuleta. Viola Archuleta then changed her story and told officers that Maestas had been at the residence, but she believed that he had left. She ultimately admitted to lying about knowing that Maestas was hiding in the house and she apologized to the officers for her lies.

Several officers entered the residence and began to search for Maestas. The officers found a pull-down stairway leading to the attic space. It appeared that someone was concealed in the attic space because the rope to pull down the stairs had apparently been tied off from inside the attic space. The officers tugged on the stairs and were able to pull them down.

The officers shouted commands for the persons hiding in the attic to show themselves. Matthew Roberts came to the stair opening and surrendered to the officers. Roberts told Officer Sutera that the only two persons in the home were himself and Viola Archuleta. After Roberts heard officers arresting Maestas and it was obvious that Roberts was lying, Roberts refused to say anything more. He was taken into custody due to several outstanding arrest warrants.

South Salt Lake City Police Detective Parker saw a small opening from the finished space in the attic leading to an open unfinished area with loose and bagged insulation strewn about. As he peered through the small opening, he imitated the sound of a dog, hoping to prompt anyone hiding to show themselves. He saw movement under a pile of insulation and ordered the person hiding to show himself. Detective Parker and Officer Studstrup took this person into custody and identified him as Robert Maestas. Maestas claimed that he was not "aware of" anyone else hiding in the unfinished portion of the attic. A couple of minutes later, Maestas said that his "cousin" was still hiding in the attic.

Much of the unilluminated open attic space lie around a corner from the small opening. Believing that someone could still be hiding in the attic, officers continued to shout commands for some ten to fifteen minutes. As part of their commands, the officers shouted that they were calling for a police service dog to assist in the search of the attic. At approximately that point, Unified Police Department Officer Luis Lovato and his police service dog Aldo arrived. Lovato and Aldo climbed the ladder into the finished portion of the attic.

Officer Lovato shouted multiple standard police service dog warnings into the unfinished portion of the attic. He loudly identified himself as a police officer and said that he was sending a police service dog to search the attic and commanded anyone hiding in the attic to call out and surrender and that the dog would not be sent if the person surrendered. Lovato also shouted into the attic that any person hiding there would be bitten by the dog if the person remained hidden. Lovato waited a few moments and listened for the sounds of anyone surrendering. When he heard no one call out, he loudly repeated the same warnings.

Officer Lovato then commanded Aldo to search the attic. Aldo ran through the attic and barked, indicating that he detected scent. Lovato repeated the search command. Aldo went around the corner of the attic, outside of Lovato's view. Plaintiff was hiding in the insulation. Plaintiff had hidden with Roberts and Maestas from the time that police first arrived at the residence. He remained there during the time that Roberts and Maestas were taken into custody. He heard the many warnings and police service dog announcements. Aldo bit plaintiff. Officer Lovato removed Aldo from plaintiff as soon as the other officers secured plaintiff. The officers provided first aid until paramedics attended to plaintiff.

Officer Lovato spoke with plaintiff at the hospital. Plaintiff told him that he had heard the police service dog warnings. Plaintiff reaffirmed in sworn testimony that he had heard the commands shouted prior to the dog entering the attic to search. Plaintiff decided to remain in hiding because of the seriousness of Maestas's crimes and his participation in hiding with a wanted felon. Plaintiff gave his name as Tony Alfred Archuleta. The officers did not believe that plaintiff was being truthful because he could not provide a Social Security number. Plaintiff was later identified as Leo Archuleta.

a. **The decision to deploy a police service dog to locate persons hiding in the attic was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams.**

    1. The decision to deploy a police service dog to locate a suspect is best made when police service dog handler considers the reported facts available at the time of deployment. Such decisions are necessarily often made in tense, uncertain and rapidly unfolding situations, and with limited information available and uncertain confirmation of that information. This was the case at the time of deploying the police service dog team to search for persons hiding in the attic of the Archuleta residence.

    2. Officers requested the services of a police service dog team to search the attic. The officers had the following information at the time that they went to the residence at 3555 South 1300 East to search for Maestas:

a.   Officers were attempting to apprehend a suspect in major felony crimes (rape of a child and aggravated sexual assault of a child) involving a significant safety risk to the public.

b.   The principal suspect (Maestas) was reported to be associated with a set of the local Crips criminal street gang, a gang known for violence and criminal conduct. The officers were familiar with this gang and were aware that criminal street gang members often commit crimes together and often protect one another in their criminal enterprises. Officers in this area are generally familiar with various criminal street gangs active in the Salt Lake valley and know that criminal street gangs espouse a strong value of protecting one another from the law and concealing one another's crimes.

c.   Margaret Maestas, a credible source with no apparent motive to lie to the police and who had current personal knowledge of the circumstances at the residence, reported that Maestas was in the company of dangerous persons.

d.   Margaret Maestas had confirmed reports that Maestas had committed multiple serious felony sexual assaults against children.

e.   Margaret Maestas also reported that Maestas had been known to carry a gun and that he would fight the officers when they attempted to take him into custody.

f.   Maestas intended to imminently leave the state of Utah.

3.   Once the officers arrived at 3555 South 1300 East to attempt to find Maestas, they learned additional factors, including:

a.　The woman later identified as Viola Archuleta did not intend to cooperate with reasonable efforts to communicate with her as she ignored the officers knocking on the door and window. She continued to speak to someone on the telephone. It can be very dangerous for a suspect to make a telephone call or other electronic communication during an active investigation, particularly an investigation where an arrest may reasonably be anticipated. An officer cannot know whether the person is calling confederates to assist in assaulting the police or to facilitate an escape from the officers. This would be significantly troublesome when dealing with persons associated with a criminal street gang, such as Maestas. Even seemingly innocent conversation may contain hints or prearranged signals for confederates to aid in illegal action against the officers. Viola Archuleta's persistence in speaking on the telephone and ignoring officers would be cause for concern by reasonable and well-trained police officers.

b.　Viola Archuleta actively obstructed the officers' efforts to apprehend Maestas as she lied to the officers.

c.　It soon became apparent that someone was hiding in the residence and the officers knew that person or persons had not been searched for weapons. This fact became more significant in the context of Margaret Maestas's description of the character of persons that she had seen at the residence.

d.　Maestas and the other persons in hiding were actively resisting efforts to apprehend Maestas and other potential suspects. The officers did not yet

know why the other persons would hide, but would reasonably understand that they could be confederate with Maestas or concerned about their own criminality. This later proved to be accurate. Roberts was the subject of multiple arrest warrants. Leo Archuleta, a veteran prison inmate and felon, was worried about his liability for assisting in hiding a person wanted for serious sex crimes.

4.     Officer Lovato had been called to assist in the search for a person wanted for serious violent sex crimes. Officer Lovato made his own independent evaluation of the reported facts prior to deploying police service dog Aldo to search for persons hiding in the attic. Although he had reason to believe that the person initially identified as the main suspect–Maestas–had been caught, Officer Lovato also knew that it was likely that at least one other person was still hiding in the dark attic. He also knew that the officers suspected that person of committing a felony crime of obstructing justice in connection with their efforts to apprehend Maestas. Officer Lovato knew that there could be some risk to his police service dog in sending him to search the attic, but recognized that there was a greater risk for officers who would have to crawl into the dark attic with its concealment and ambush possibilities.

5.     Officer Lovato continued to assess Aldo's search for persons hiding in the attic as he closely observed and interpreted Aldo's behavior. He saw Aldo sniff and heard him bark. Officer Lovato knew that this behavior was consistent was with detecting a person in hiding in the attic. He closely watched Aldo and was

positioned to give a recall command to Aldo should the hidden suspect decide to call out in surrender.

6.    Searching an enclosed area and particularly searching an enclosed area featuring blind corners, crevices and compartments, with a police service dog minimizes the risk to officers and takes advantage of the police service dog's unique sensory abilities.  Deploying a police service dog for a search of such an area also reduces risks to the suspect that can be inherent with other force options.  For example, if the officers were required to search the dark attic with its blind corner and ample concealment features it would be sound police practice to search with guns drawn and pointed.  Even under the optimal circumstances, there is an obvious increased danger to all when firearms are at the ready.

7.    Provided with the same information that was reported to or observed by Officer Lovato, a reasonable and properly trained police service dog handler would have recognized that deploying a police service dog to search for and potentially apprehend persons hiding in the attic was consistent with generally accepted policies, practices and training for police service dog teams.

b.    **The police service dog team actions in the search for persons hiding in the attic were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.**

1.    Consistent with policy and generally accepted police training and practices, Officer Lovato shouted repeated warnings prior to sending police service dog Aldo to search the attic for persons hiding from the police.  The warnings stated that police

were in the residence, a police service dog team was present and that any persons hiding in the attic should make themselves known in order to avoid a potential dog bite. Officer Lovato gave Aldo a command to be quiet and then Officer Lovato carefully listened for anyone calling out to surrender. He did not hear anyone do so.

2.      Plaintiff spoke with Officer Lovato at the hospital and acknowledged that heard and disregarded the warnings. Plaintiff clearly heard and understood the warnings, as he later reaffirmed during sworn testimony.

3.      Officer Lovato gave police service dog Aldo a search command. Officer Lovato knew that Aldo could potentially bite the person hiding in the attic if the person moved. Officer Lovato watched Aldo as he searched the attic area, although Officer Lovato could not see around the blind corner at the end of the attic space.

4.      Officer Lovato's decision to give the search command was a reasonable option, consistent with generally-accepted police service canine team training and practices.

5.      Plaintiff chose to remain hidden and chose to ignore the warnings and chose to expose himself to the possibility of a bite by a police service dog.

6.      Aldo bit plaintiff. Officer Lovato limited plaintiff's exposure to Aldo's bite by commanding plaintiff to stop fighting Aldo and by removing Aldo from plaintiff as soon as plaintiff's hands were under the control of other officers. Officer Lovato's action in removing Aldo from plaintiff at that point was consistent with generally-accepted police service canine team training and practices.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I became certified as a law enforcement officer in the State of Utah in 1982. My duties include direct supervision and command of various investigative units and agents throughout the State of Utah, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as approximately one dozen part-time peace officer employees. I command the State of Utah Child Abduction Response Team. I command the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the

American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the

Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.    Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force

training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force and police service dog policies in current use by more than 1,400 police agencies and correctional facilities in the United States.

10.     **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Post Incident Video Review,* Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer,

September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.  **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.  **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013. Deposition testimony given on behalf of the defendants. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants. *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of

Florida, 2012. Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.*, No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. *Cavanaugh v. Woods Cross City, et al.*, No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony given on behalf of the defendants. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of defendants. *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Trestyn & Herren*, No. 09-

CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected

onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The decision to deploy a police service dog to locate persons hiding the attic of the Archuleta residence while officers were apprehending a person wanted for a dangerous felony was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams. Officers gave multiple warnings prior to sending the police service dog into the attic. Nonetheless, plaintiff decided to ignore the several opportunities to make himself known and chose to remain hidden from police when police service dog Aldo was sent to search the attic. The police service dog team actions in the search for persons hiding in the attic were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.

Kenneth R. Wallentine
July 12, 2013

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123