Stephen D. Spencer (8913)

Spencer Law Office, PLLC

4625 S. 2300 E. Suite 106
Salt Lake City, UT 84117
Telephone: (385) 695-2232
Email: steve@stevespencerlaw.com

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LEO A. ARCHULETTA;<br>VIOLA E. ARCHULETTA,<br><br>      Plaintiffs,<br><br>v.<br><br>CITY OF SOUTH SALT LAKE;<br>UNIFIED POLICE DEPARTMENT;<br>DARREN CARR; OFFICER LAVATO;<br>CHAD LEETHAM; JAKE PARKER;<br>JOSEPH STUDSTRUP; JOSEPH SUTERA;<br>JOHN DOES 1-10.<br><br>      Defendants. | **MOTION TO STRIKE INADMISSIBLE SUMMARY JUDGMENT EVIDENCE and F.R.C.P. 56 (c) (2) OBJECTION**<br><br><br><br><br><br>Case No. 2:12-cv-00703-TC<br><br>Judge Tena Campbell |

COMES NOW Stephen D. Spencer, counsel for the Plaintiff, and pursuant to Fed. R. Civ.

P. 56(c) and D.U. Civ. R. 7-1(b)(3)(A), moves the Court for relief as follows:

1. The Court should strike the declaration of Kenneth Wallentine, attached to

   Defendants' Motion for Summary Judgment.

2. As grounds for this motion, Plaintiff sets forth the following memorandum:

## STATEMENT OF FACTS

1.     In support of their Motion for Summary Judgment, Defendants rely in part on evidence that is inadmissible, including evidence that is irrelevant, hearsay, lacks foundation, and assumes facts not in evidence.

2.     Inadmissible evidence is improper for summary judgment purposes. See F.R.C.P. 56.

3.     Plaintiffs object to the declaration of Kenneth Wallentine as inadmissible evidence as set forth in Defendants' Memorandum in Support of their Motion for Summary Judgment.

*Particularly, Plaintiff objects to the following averments as set forth in the declaration of Kenneth Wallentine:*

1. *Paragraph 9(i):  Officer Lovato had been called to assist in the search for a person wanted for serious violent sex crimes. Although he had reason to believe that the person initially identified as the main suspect — Maestas — had been caught, Officer Lovato also knew that it was likely that at least one other person was still hiding in the dark attic. He also knew that the officers suspected a person committing a felony crime of obstructing justice in connection with their efforts to apprehend Maestas. Officer Lovato knew that there could be some risk to his police service dog in sending him to search the attic, but recognized that there was a greater risk for officers who would have to crawl into the dark attic with its concealment and ambush possibilities.*

**Objection:     The foregoing is lacking in foundation in many respects. This statement is lacking in foundation as to what Officer Lovato supposedly "knew" or what other objective facts would have apprised officers of any purported danger, especially any**

**purported imminent and serious danger. It assumes facts not in evidence. It also relies upon statements that are hearsay.**

2. Paragraph 9 (ii): *Searching an enclosed area and particularly searching an enclosed area featuring blind corners, crevices and compartments, with a police service dog minimizes the risk to officers and takes advantage of the police service dog's unique sensory abilities.*

   **Objection:        The foregoing is lacking in foundation as to make it relevant. Any record is insufficient as to establish facts assumed for hypothecation – i.e. whether there were "blind corners, crevices, or compartments." The record shows Leo Archuletta was around a corner and about ten feet away from Officer Lovato. There is no record of any crevices or compartments.**

3. Paragraph 9(iii): *The decision to deploy a police service dog to locate persons hiding in the attic was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams.*

   **Objection:        The foregoing is lacking in foundation as to what is consistent with generally accepted policies, etc. It also usurps the function of the jury in determining what is an objectively reasonable use of force under the circumstances, whatever the jury determines them to be.**

4. Paragraph 9 (iv): *The police service dog team actions in the search for persons hiding in the attic were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.*

**Objection:** The foregoing is lacking in foundation as to what is consistent with generally accepted policies, etc. It also usurps the function of the jury in determining what is an objectively reasonable use of force under the circumstances, whatever the jury determines them to be.

5. Paragraph (1) (a)(1) of report: *The decision to deploy a police service dog to locate persons hiding in the attic was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams. The decision to deploy a police service dog to locate a suspect is best made when police service dog handler considers the reported facts available at the time of deployment. Such decisions are necessarily often made in tense, uncertain and rapidly unfolding situations, and with limited information available and uncertain confirmation of that information. This was the case at the time of deploying the police service dog team to search for persons hiding in the attic of the Archuleta residence.*

**Objection:** This statement usurps the function of the jury by dictating what is objectively reasonable under the circumstances as the jury finds them to be.

6. Paragraph 2 (a) – (f) *Officers requested the services of a police service dog team to search the attic, The officers had the following information at the time that they went to the residence at 3555 South 1300 East to search for Maestas: a. Officers were attempting to apprehend a suspect in major felony crimes (rape of a child and aggravated sexual assault of a child) involving a significant safety risk to the public.*

*b. The principal suspect (Maestas) was reported to be associated with a set of the local Crips criminal street gang, a gang known for violence and criminal conduct. The officers were familiar with this gang and were aware that criminal street gang members often commit crimes together and often protect one another in their criminal enterprises. Officers in this area are generally familiar with various criminal street gangs active in the Salt Lake valley and know that criminal street gangs espouse a strong value of protecting one another from the law and concealing one another's crimes. c. Margaret Maestas, a credible source with no apparent motive to lie to the police and who had current personal knowledge of the circumstances at the residence, reported that Maestas was in the company of dangerous persons. d. Margaret Maestas had confirmed reports that Maestas had committed multiple serious felony sexual assaults against children. e. Margaret Maestas also reported that Maestas had been known to carry a gun and that he would fight the officers when they attempted to take him into custody. f. Maestas intended to imminently leave the state of Utah.*

**Objection:   The foregoing is lacking in foundation as to what supposedly constituted "a significant safety risk to the public." Certainly, the crime for which they were investigating Robert Maestas was a serious one. However, the real issue is not a concern for the safety of the public, but whether the circumstances were so exigent that it eliminated the warrant requirement, and the statement is lacking in foundation as to that issue and is therefore irrelevant. The statement that Maestas**

**was known to be associated with a local Crips gang is lacking in foundation. Several South Salt Lake officers stated in their declarations attached to Defendants' motion that this was the case. Such statements were not provided prior to the Motion for Summary Judgment in violation of Rule 26. Moreover, none of the police reports contain such a statement, and therefore whether this was a fact "known" or reported to officers who responded to Plaintiff's residence is a justiciable issue. The claimed statements of Margaret Maestas ARE hearsay, to the extent that it is not offered only for the effect upon the hearer. Margaret Maestas may deny making such a statement.**

7.  Paragraph 3 (a) – (j) Once the officers arrived at 3555 South 1300 East to attempt to find Maestas, they learned additional factors, including: a. The woman later identified as Viola Archuleta did not intend to cooperate with reasonable efforts to communicate with her as she ignored the officers knocking on the door and window. She continued to speak to someone on the telephone. It can be very dangerous for a suspect to make a telephone call or *Viola Archuleta actively obstructed the officers' efforts to apprehend Maestas as she lied to the officers. c. It soon became apparent that someone was hiding in the residence and the officers knew that person or persons had not been searched for weapons. This fact became more significant in the context of Margaret Maestas's description of the character of persons that she had seen at the residence. d. Maestas and the other persons in hiding were actively resisting efforts to apprehend Maestas and other potential suspects. The officers did*

*not yet know why the other persons would hide, but would reasonably understand that they could be confederate with Maestas or concerned about their own criminality. This later proved to be accurate. Roberts was the subject of multiple arrest warrants. Leo Archuleta, a veteran prison inmate and felon, was worried about his liability for assisting in hiding a person wanted for serious sex crimes. Other electronic communication during an active investigation, particularly an investigation where an arrest may reasonably be anticipated. An officer cannot know whether the person is calling confederates to assist. in assaulting the police or to facilitate an escape from the officers. This would be significantly troublesome when dealing with persons associated with a criminal street gang, such as Maestas. Even seemingly innocent conversation may contain hints or prearranged signals for confederates to aid in illegal action against the officers. Viola Archuleta's persistence in speaking on the telephone and ignoring officers would be cause for concern by reasonable and well-trained police officers.*

**Objection:     This statement assumes many facts not in evidence. Moreover, it is irrelevant as it does not establish sufficient grounds for an exigency. It is also irrelevant because there is no claim or even possibility that "confederates" had arrived or may have arrived before Plaintiff was seized or at any other relevant time. Officers had surrounded the house by that time. It is lacking in foundation and assumes facts not in evidence about what officers knew about any other person who might have been hiding in the residence. What later proved to be accurate is irrelevant. Any claims of character evidence against Plaintiff are**

**irrelevant. A convict's Fourth Amendment rights are no less important than anyone else's. This statement usurps the function of the jury and is not evidence but argument.**

8. Paragraph 4: *Officer Lovato had been called to assist in the search for a person wanted for serious violent sex crimes. Officer Lovato made his own independent evaluation of the reported facts prior to deploying police service dog Aldo to search for persons hiding in the attic. Although he had reason to believe that the person initially identified as the main suspect—Maestas—had been caught, Officer Lovato also knew that it was likely that at least one other person was still hiding in the dark attic. He also knew that the officers suspected that person of committing a felony crime of obstructing justice in connection with their efforts to apprehend Maestas. Officer Lovato knew that there could be some risk to his police service dog in sending him to search the attic, but recognized that there was a greater risk for officers who would have to crawl into the dark attic with its concealment and ambush possibilities.*

**Objection:       This statement is lacking in foundation and is speculative as to what Officer Lovato "knew." He did actually "know" that Maestas had been caught – he did not merely have "a reason to believe." This statement usurps the function of the jury.**

9. Paragraph 5: *Officer Lovato continued to assess Aldo's search for persons hiding in the attic as he closely observed and interpreted Aldo's behavior. He saw Aldo sniff and heard him bark. Officer Lovato knew that this behavior was consistent was with detecting a person in hiding in the attic. He closely watched Aldo and was positioned*

*to give a recall command to Aldo should the hidden suspect decide to call out in surrender.*

**Objection:     This statement is cumulative in light of the claims of Officer Lovato as set forth in his deposition.**

10. Paragraph 6:     *Searching an enclosed area and particularly searching an enclosed area featuring blind corners, crevices and compartments, with a police service dog minimizes the risk to officers and takes advantage of the police service dog's unique sensory abilities. Deploying a police service dog for a search of such an area also reduces risks to the suspect that can be inherent with other force options. For example, if the officers were required to search the dark attic with its blind corner and ample concealment features it would be sound police practice to search with guns drawn and pointed. Even under the optimal circumstances, there is an obvious increased danger to all when firearms are at the ready.*

**Objection:  The foregoing is lacking in foundation for the assertions made, especially with regard to "obvious" increased danger. It is also lacking in foundation as to facts assumed.**

11. Paragraph 7:     The police service dog team actions in the search for persons hiding in the attic were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.

**Objection: The foregoing is lacking in foundation and usurps the function of the jury.**

## **ARGUMENT**

**First Argument**: Any statements about what officers knew after the alleged constitutional violation should be stricken.

A police officer's use of force violates the Fourth Amendment where his use of force was not "'objectively reasonable' in light of the facts and circumstances confronting" him at the timeof his use of force. See <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. Although the Graham standard is an objective one, asking what a reasonable officer would have done in the defendant's stead, the only evidence that may be considered in assessing whether the officer's conduct is objectively reasonable is the evidence that was subjectively known to the defendant officer at the time of his conduct.

In <u>Palmquist v. Selvik,</u> 111 F.3d 1332, 1341 (7th Cir. 1997), a defendant officer shot a man who was swinging a muffler pipe at officers, and the man's estate sued the officer alleging excessive force under the Fourth Amendment. The defendant officers sought to introduce evidence that the night before the shooting, the decedent was arrested for alcohol and marijuana possession, that he was intoxicated, and that he had a "desire to commit 'suicide by police[.]'" The lower court excluded such evidence because the defendant officers were unaware of it at the time they decided to shoot the decedent.

"[T]he magistrate judge limited the defense's evidence to the officers' personal knowledge-their experiences and observations-during the morning in question. Sergeant Selvik did not know Palmquist's motivation and intent when he shot him, the magistrate judge reasoned, and thus the evidence had no bearing on whether Selvik acted reasonably." Id. at 1339. On appeal, the Seventh Circuit affirmed the trial court's exclusion of the later-discovered evidence that the defendant officers "knew nothing" of at the time of the alleged excessive force. "[W]hen considering a charge of excessive force under the Fourth Amendment, evidence outside the time frame of the shooting is irrelevant and prejudicial." Id. at 1339.

The Palmquist Court's decision was based on another Seventh Circuit cause, Sherrod v. Berry, 856 F.2d 802 (7th Cir.1988) (en banc). In Sherrod, a police officer approached a robbery suspect's car from behind, and after the suspect made a quick movement toward his coat, the officer shot him dead. 856 F.2d at 803. The trial court admitted evidence that the deceased was unarmed when shot. The officer challenged this ruling on appeal. The Seventh Circuit, sitting en banc, agreed with the officer:

*Knowledge of facts and circumstances gained after the fact ... has no place in the*

*... jury's post-hoc analysis of the reasonableness of the actor's judgment. Were the*

*rule otherwise, ... the jury would possess more information than the officer*

*possessed when he made the crucial decision. Thus, we are convinced that the*

*objective reasonableness standard ... requires that [the officer's] liability be*

*determined exclusively upon an examination and weighting of the information*

*[the officer] possessed immediately prior to and at the very moment he fired the*

*fatal shot. The reception of evidence or any information beyond that which [the*

*officer] had and reasonably believed at the time he fired his revolver is improper,*

*irrelevant and prejudicial to the determination of whether [the officer] acted*

*reasonably 'under the circumstances.'*

856 F.2d at 805; see also, <u>Wallace v. Mulholland</u>, 957 F.2d 333 (7th

Cir.1992)(affirming exclusion of excessive force victim's mental condition, of which

officers had "little, if any, specific information about" at the time they used force;

concluding the proper focus "that case was Michael's actual behavior, and the way the

police officers responded to it.")

In this case, the Court should strike all of the evidence in the Declaration of Kenneth

Wallentine or elsewhere that Defendants were unaware of prior to the alleged constitutional

violations, because the evidence does not tend to prove whether or not Defendants violated

Plaintiff's Fourth Amendment rights.

**<u>Second Argument</u>:  Although expert testimony is not necessarily objectionable in a civil**

**case because it embraces an ultimate issue, the declaration of Kenneth Wallentine is not**

**helpful to the trier of fact, is lacking in foundation, and is therefore not useful or**

**appropriate.**

*"...[t]he true test of admissibility of expert testimony is not whether the subject matter is*

*common or uncommon, or whether many persons or few have some knowledge of the matter; but*

*it is whether the witnesses offered as experts have any peculiar knowledge or experience, not*

*common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue."* 7 Wigmore Evidence, § 1923 (Chadbourn Rev. 1978).

Expert testimony may be used to help the jury to determine a fact in issue based on the expert's specialized knowledge, experience, or skill and is necessary in cases in which the subject matter falls outside the realm of ordinary lay knowledge. Stated differently, expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge. Expert testimony is permitted to state an opinion based on facts not within his firsthand knowledge or may base his opinion on information made available before the hearing so long as it is the type of information that is reasonably relied upon in the field to make opinions. See Rule 703.

For these reasons, expert testimony receives additional scrutiny relative to other evidentiary decisions. Specifically, in executing its "gatekeeping" duties, the trial court must make three key preliminary findings which are fundamental to Rule 702 before the jury may consider expert testimony. First, the trial court must find that the subject matter is beyond the ordinary knowledge of the jury, thus requiring an expert to explain the matter to the jury. Next, while the expert need not be a specialist in the particular branch of the field, the trial court must find that the proffered expert has indeed acquired the requisite knowledge and skill to qualify as an expert in the particular subject matter. Finally, the trial court must evaluate the substance of the testimony and determine whether it is reliable.

## Application of F.R.E. 702-704: Testimony by Experts

Rule 702:

*(a) Subject to the limitations in paragraph (b), a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.*

*(b) Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony*

*(1) are reliable,*

*(2) are based upon sufficient facts or data, and*

*(3) have been reliably applied to the facts.*

*(c) The threshold showing required by paragraph (b) is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community.* (S.

(Mr. Spencer's Note: This is the Frye test)

Rule 703. Bases of an Expert's Opinion Testimony

*An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of*

*the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.*

Rule 704. Opinion on Ultimate Issue

*(a) In General - Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.*

(Mr. Spencer's note: Rule 608(a)(1) bars admission of an expert's testimony as to the truthfulness of a witness on a particular occasion).

*(b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.*


## I.     Daubert v. Merrell Dow Pharmaceuticals

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 584-587, 509 U.S. 579, 584-587. 509 U.S. 579, 584-587 (1993). Concerns which held that Rule 702 of the Federal Rules of Evidence did not incorporate the Frye "general acceptance" test as a basis for assessing the admissibility of scientific expert testimony. In Daubert, seven members of the Court agreed on the following guidelines for admitting scientific expert testimony:

•     Judge is gatekeeper: Under Rule 702, the task of "gatekeeping", or assuring that scientific expert testimony truly proceeds from "scientific knowledge", rests on the trial judge.

•      Relevance and reliability: This requires the trial judge to ensure that the expert's testimony is "relevant to the task at hand" and that it rests "on a reliable foundation". Daubert v.

Merrell Dow Pharms., Inc., about expert testimony cannot be simply referred to the jury as a question of weight. Furthermore, the admissibility of expert testimony is governed by Rule 104(a), not Rule 104(b); thus, the Judge must find it more likely than not that the expert's methods are reliable and reliably applied to the facts at hand.

• Scientific knowledge = scientific method/methodology: A conclusion will qualify as scientific knowledge if the proponent can demonstrate that it is the product of sound "scientific methodology" derived from the scientific method.

• Factors relevant: The Court defined "scientific methodology" as the process of formulating hypotheses and then conducting experiments to prove or falsify the hypothesis, and provided a non-dispositive, nonexclusive, "flexible" set of "general observations" (i.e. not a "test") [5] that it considered relevant for establishing the "validity" of scientific testimony:

1. Empirical testing: whether the theory or technique is falsifiable, refutable, and/or testable.

2. Whether it has been subjected to peer review and publication.

3. The known or potential error rate.

4. The existence and maintenance of standards and controls concerning its operation.

5. The degree to which the theory and technique is generally accepted by a relevant scientific community.

In 2000, Federal Rule 702 was amended in an attempt to codify and structure elements embodied in the "Daubert trilogy." The federal rule then read as follows:

## Federal Rule 702. Testimony by Experts

*If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

(As amended Apr. 17, 2000, eff. Dec. 1, 2000.)

In 2011, Rule 702 was again amended.

The Daubert decision has been heralded by some political commentators as one of the most important Supreme Court decisions in imposing higher barriers for toxic tort and product liability cases, by allegedly reducing the volume of so-called junk science in the court room.

Prior to Daubert, relevancy in combination with the Frye test were the dominant standards for determining the admissibility of scientific evidence in Federal courts. Frye is based on a 1923 Federal Court of appeals ruling involving the admissibility of polygraph evidence. (i.e. that it is inadmissible). Under Frye, the Court based the admissibility of testimony regarding novel scientific evidence on whether it has "gained general acceptance in the particular field in which it belongs." The trial court's gatekeeper role in this respect is typically described as conservative, thus helping to keep pseudoscience out of the courtroom by deferring to those in the field.

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (Frye v. United States).

In Daubert, the Supreme Court ruled that the 1923 Frye test was superseded by the 1975 Federal Rules of Evidence, specifically Rule 702 governing expert testimony. Rule 702 originally stated (in its entirety),

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In Daubert, the Court ruled that nothing in the Federal Rules of Evidence governing expert evidence "gives any indication that 'general acceptance' is a necessary precondition to the admissibility of scientific evidence. Moreover, such a rigid standard would be at odds with the Rules' liberal thrust and their general approach of relaxing the traditional barriers to 'opinion' testimony."

The proponent of expert testimony must lay a foundation before the expert will be permitted to testify. This foundation consists of demonstrating that the topic is a proper subject

for expert testimony, that the witness qualifies as an expert, and that, if the testimony is based on a novel scientific test or principle, it is generally accepted in the relevant scientific community.

Expert opinion must be more than merely relevant. It must also assist the trier of fact because the topic is one about which most people would not be knowledgeable. A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Section 801(b) states the general rule that the expert may base an opinion on personal knowledge or facts made known to him.

## <u>CONCLUSION</u>

The Kenneth Wallentine declaration and report is not helpful to the finder of fact. It does not assist the trier of fact to understand the evidence or to determine a fact at issue. It usurps the fact-finding function of the Court and attempts to resolve the ultimate legal issues. This declaration does not contain proper subjects for expert testimony. It is merely opinion on ultimate legal issues based upon some undisputed facts but also based upon assumptions of fact that are taken in the light most favorable to the Defendants. It is not therefore based upon sufficient data. Mr. Wallentine's background and education do not qualify him to usurp the Court's function in determining ultimate legal issues. This is not a proper subject for expert testimony as presented.

DATED this 7th day of October, 2013.

/S/  Stephen D. Spencer
Stephen D. Spencer
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing Motion to Strike Inadmissible Summary Judgment Evidence to be served upon the following via the Court's electronic filing system.

Andrew M. Morse & R. Scott Young

intakeclerk@scmlaw.com, amorse@scmlaw.com

Court; client

DATED this 7th day of October, 2013.

/S/ Stephen D. Spencer
Stephen D. Spencer
**Attorney for Plaintiffs**