IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LEO A. ARCHULETTA, and VIOLA E. ARCHULETTA,<br><br>     Plaintiffs,<br><br><br>  vs.<br><br><br>CITY OF SOUTH SALT LAKE; UNIFIED POLICE DEPARTMENT; DARREN CARR; OFFICER LOVATO; CHAD LEETHAM; JAKE PARKER; JOSEPH STUDSTRUP; JOSEPH SUTERA, and JOHN DOES 1-10,<br><br>    Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:12-CV-703-TC |

   Defendants Unified Police Department and Officer Luis Lovato (the only remaining defendants in this Section 1983 civil rights suit) (collectively, "Defendants") have filed a motion for summary judgment on Plaintiff Leo Archuletta's claims for illegal entry, illegal search, excessive force, municipal liability, assault and battery, and respondeat superior. For the reasons set forth below, the court holds that (1) Officer Lovato's entry into the house was justified because he reasonably relied on the presence and representations of officers already at the scene; (2) his search of the crawl space was a valid protective sweep; (3) Officer Lovato's use of a police dog to find and secure Mr. Archuletta in the attic crawl space was a reasonable level of force under the circumstances; and (4) the court does not have jurisdiction over Mr. Archuletta's state law claim. Because the court finds that Officer Lovato did not violate Mr. Archuletta's

constitutional rights, neither Officer Lovato nor his employer, the Unified Police Department, is liable to Mr. Archuletta, and so the Defendants' motion for summary judgment is GRANTED.

## **FACTUAL BACKGROUND**[1]

Plaintiff Leo Archuletta claims that his constitutional rights were violated by Officer Luis Lovato during events that occurred on April 12, 2012, at Mr. Archuletta's home in the City of South Salt Lake. Officer Lovato is a police officer employed by Co-Defendant Unified Police Department (UPD). He handles a police dog named Aldo and is sometimes referred to as a "K9 officer."

On April 12, 2012, Officer Lovato received a call from the South Salt Lake (SSL) Police Department (through police dispatch) requesting his assistance and the assistance of his patrol dog Aldo. They called him to a house where, according to the dispatch operator, a rape suspect (Robert Maestas) was "barricaded." (Dep. of Vincente Luis Lovato at 30.) That house was Mr. Archuletta's house.

The SSL police officers[2] were searching for Mr. Maestas, who was accused of sexually assaulting two minor girls. They received a tip that Mr. Maestas was staying at a house located at 3555 South 1300 East in South Salt Lake.

When they arrived at the house, Mr. Maestas and Mr. Archuletta were both there (although the police officers did not know that at the time). As soon as the officers knocked on the door, Mr. Maestas and Mr. Archuletta (who was not suspected of any crime) hid in a crawl

---

[1]The court finds that there are no genuine disputes of material facts.

[2]Some of those officers, as well as the City of South Salt Lake, were Co-Defendants of Officer Lovato, but they have since been dismissed from the case.

space in the attic. Mr. Archuletta's wife, Viola,[3] answered the door and the officers entered the house without a warrant. For purposes of analysis, the court assumes, without deciding, that the SSL police officers illegally entered the house. No UPD officer participated in the initial entry into Mr. Archuletta's home. (Decl. of SSL Police Officer Jake Parker (Ex. 3 to Defs.' Mem. Supp. Mot. Summ. J.) ¶ 4; Decl. of SSL Police Officer Darren Carr (Ex. 2 to Defs.' Mem. Supp. Mot. Summ. J.) ¶ 16.)

The officers entered the home to look for Mr. Maestas. They called out to anyone in the house and threatened to use a police dog if the person did not come out of hiding. Eventually they found Mr. Maestas hiding in the crawl space after he flinched and revealed his location.

Mr. Maestas surrendered and the officers took him into custody. When they asked him whether anyone else was hiding in the attic, Mr. Maestas responded, "Not that I know of." (Parker Decl. ¶ 11.) According to one of the SSL police officers, "Because Mr. Maestas did not simply tell me 'no,' I believed that at least one more individual was hiding in the crawl space." (Id. ¶ 12.)

All of this happened while Officer Lovato and Aldo were on their way to the house. As Officer Lovato traveled to the house, he listened to his radio to follow events. "I heard someone on the radio saying that they were challenging the suspects. So by the time I arrive there, I just figured everything was pretty much over." (Lovato Dep. at 32.) Officer Lovato arrived at the house about ten to fifteen minutes after receiving the call for assistance. He took Aldo to the backyard where other officers were waiting and "established a containment position just in case

---

[3]Viola Archuletta, who was a plaintiff in this case, has since passed away.

somebody was still in the house and tried to flee." (Id.) But he was told by another officer to go inside the house because the officers needed Officer Lovato's (and Aldo's) assistance. He went inside the house and was directed upstairs to the loft area. He announced that he was bringing his dog up to the loft. When he arrived at the area near the crawl space, he saw four or five officers waiting. The officers had their weapons drawn.

Officer Lovato was "advised that they had two in custody and they believed that there was a third person in the attic. I was told they had been making K9 announcements since they had called for me and that they needed to clear the crawl space." (Lovato Dep. at 37.)[4] None of the officers told Officer Lovato about Mr. Maestas's statement or why they had a suspicion that at least one more person might be in the crawl space. (Id. at 39.)

The officers told Officer Lovato that the rape suspect had been hiding in the crawl space and that if another person was hiding in the crawl space (and they suspected there was), the officers were going to charge him with felony obstruction. Officer Lovato "was also advised of . . . the officers' safety concerns." (Id. at 46.) The record does not disclose whether the nature of those "safety concerns" was ever articulated to Officer Lovato. No one told him that they feared that a person in the crawl space was armed.

But Officer Lovato apparently, and unsurprisingly, filled in the blanks based on his own experience and assessment of the situation he confronted. He indicated during his deposition that the crawl space posed a danger to any officer who entered the space without knowing what lay

---

[4]Plaintiff makes a hearsay and foundation objection to the Defendants' use of statements made to Officer Lovato. (See Pl.'s Opp'n Mem. (Docket No. 33) at 17.) The objection is overruled because the statements are not offered to prove the truth of the matter but rather to paint a picture of what Officer Lovato experienced and the backdrop for his actions.

ahead: "Based on the nature of the crawl space, if officers believed someone else was in there in the blind corners, the low lighting, the fact officers would have to be on their knees, a police service dog was the safest way to clear the attic." (Lovato Dep. at 81.) He stated that there were no sensible alternatives to using a police dog to clear the attic.

> Q.  . . . [W]ere there alternative means of clearing the attic?  I assume there would be.
>
> A.  Officers.
>
> Q.  Okay.  The officers could go in their [sic] themselves?
>
> A.  Yes.
>
> Q.  Which is potentially more dangerous to the officers?
>
> A.  Considerably more dangerous to the officers.
>
> Q.  Are there other techniques or methods that are typically deployed in a situation like that?
>
> A.  I assume they could use a pole camera or maybe a robot, something to that effect.
>
> Q.  What about capsicum or pepper spray?
>
> A.  It's not really an option in a situation like that because you saturate the attic with OC spray.  You still have to go in and clear it, and generally speaking, patrol officers don't have gas masks in their vehicles.
>
> Q.  What about flash grenades, things like that, are they ever used in a situation like that, in your training or experience?
>
> A.  By tactical teams.  But not to clear an attic.  That's not something we would use a flash grenade for.

(Id. at 82-83.) He also acknowledged that if someone in the crawl space had a gun, that person could fire the gun into the area where the officers were waiting.

He did not know how long Mr. Maestas had been in custody or where he was at the time. Officer Lovato had no information about the nature of the rape charges. He did not know where or when the alleged rape occurred, or under what circumstances. When asked why he did not just leave if he knew that the rape suspect was already in custody, he said he did not consider that possibility. Instead, he said, "I assumed there was going to be continued police activities in the house, and I relied on the officers on the scene, just based on what they were asking me to do, that they were going to continue to be in the house and that the attic needed to be cleared. And I was there to support them with my K9." (Lovato Dep. at 80-81.)

Before Officer Lovato sent Aldo into the crawl space, he stood at the threshold of the crawl space and made additional announcements that he was going to send in a police dog if the person did not call out and surrender. He also announced that if the person did not come out, the dog would find him and bite him. This was standard procedure.

Aldo, a "patrol dog," is certified as an apprehension dog and is trained "in a detain method, which means that he would not bite someone unless they were either fleeing or resisting in some way." (Lovato Dep. at 10-11, 30, 46.) Aldo was trained to bite if the suspect moved or upon command from the officer. Once the dog is cued to know that it is in apprehension mode, if the dog is "off line" (meaning off his leash) and the officer is not present or the dog cannot hear the officer give a command to hold or bite, the dog will bite the suspect if he moves. (Id. at 24.) According to Officer Lovato's description of the training process, the dog treats the situation as a game. (Id. at 76-77.) As he said, there is no "enemy." "[M]ovement is what he responds to. Movement is an invitation for him to play the game." (Lovato Dep. at 77.) The dog is trained to hold on until released (physically or by command) by the K9 officer.

Officer Lovato repeated his warnings and announced that he was giving a final warning. There was no response or noticeable movement.

At that point, Officer Lovato sent Aldo in. The crawl space had two blind corners. Aldo indicated that no person was on the right side of the crawl space. So Officer Lovato focused on the left section of the crawl space. Aldo was not on a leash at that point, and Officer Lovato could not see what was around either of the corners. Aldo, however, found Mr. Archuletta, who was lying down with his feet toward Aldo. Aldo bit him in the leg. Officer Lovato did not give any command to Aldo to bite, although he did give a command that put Aldo in "apprehension mode." As noted above, if the officer is not present or the dog cannot hear the officer give a command to hold or bite, the dog will bite the suspect if he moves. (Id. at 24.)

Nothing in the record indicates what occurred right before Aldo bit Mr. Archuletta. But when Aldo did bite Mr. Archuletta, Officer Lovato, holding on to Aldo's harness, pulled Aldo and Mr. Archuletta from the crawl space. At that time, Officer Lovato saw Mr. Archuletta trying to pry Aldo's mouth from his leg. Officer Lovato called that "fighting" with the dog and said that when that happens, the dog is not going to let go and will probably tighten its hold. In fact, Aldo did not release his hold on Mr. Archuletta's leg until Officer Lovato and fellow officers had secured Mr. Archuletta's hands and Officer Lovato had performed a "standard release" move on Aldo (i.e., a move creating a gag reflex in the dog that releases the dog's jaws). There was nothing procedurally unusual about the release of Mr. Archuletta by Aldo. (Id. at 95 (it was a "standard release").) Officer Lovato called this apprehension procedure a "tactical release" (the dog bites the suspect, the handler pulls the dog and suspect back, and as soon as the suspect's hands are secure, the handler uses the "standard release" move which physically forces the dog to

release his grip on the suspect).  (Id. at 67.)

Mr. Archuletta suffered a serious leg injury from Aldo's bite.  He was treated at the hospital that day for deep puncture wounds, and that treatment was followed by two separate surgeries on his leg.

## ANALYSIS

Mr. Archuletta asserts that Officer Lovato entered the house and searched the crawl space without a valid warrant or other legal justification, and that he used his dog in a manner that constituted excessive force.  He brings Section 1983 claims against Officer Lovato for illegal entry, illegal search, and use of excessive force.[5]  He also brings a municipal liability claim

---

[5]Mr. Archuletta asserts a separate tort claim of assault and battery against Officer Lovato. The parties do not address that claim in their briefs, perhaps in part because UPD and Officer Lovato are apparently immune under the Utah Government Immunity Act, Utah Code Ann. § 63G-7-101 et al. (UGIA), from liability for the tort claim.  The UGIA "governs all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties, within the scope of employment, or under color of authority," with limited (and inapplicable) exceptions.  Utah Code Ann. § 63G-7-102(b) (emphasis added). The Unified Police Department is run by the Salt Lake County Sheriff's Office, and was formed by Salt Lake County, the Salt Lake County Sheriff's Office, and certain municipalities in unincorporated Salt Lake County.  As such, it falls within the UGIA's definition of "governmental entity."  See Utah Code Ann. §§ 63G-7-102(3), -102(7) (defining "governmental entity" as the State of Utah and its political subdivisions).  Officer Lovato, as an employee of the UPD who was acting within his scope of employment at the time of the incident, is also protected by the UGIA. See §§ 63G-7-101(2)(b), -102(2)(a), -201(1).

Mr. Archuletta's assault and battery claim fails for two reasons.  First, nothing in the record shows that he gave the requisite statutory notice to Officer Lovato or UPD under the UGIA.  Notice is required before the court has subject matter jurisdiction over the Mr. Archuletta's assault and battery claim.  See Wheeler v. McPherson, 40 P.3d 632, 635 (Utah 2002) (strict compliance with UGIA notice requirements is necessary to give court subject matter jurisdiction).  Second, even if Mr. Archuletta gave sufficient notice, the UGIA does not waive UPD's or Officer Lovato's immunity from suit for assault, battery, or violation of civil rights. §§ 63G-7-201(1), -301(5)(b).  Accordingly, the court dismisses Mr. Archuletta's claim of assault and battery.

against the Unified Police Department (UPD),[6] contending that UPD is liable for having a faulty policy on the use of police dogs and for failing to properly train Officer Lovato and Aldo. Mr. Archuletta further states that UPD's failure was grossly negligent and exhibited deliberate indifference to his rights.

In response, Officer Lovato contends that he is entitled to qualified immunity because he did not violate any of Mr. Archuletta's constitutional rights, but even if he did, his actions were objectively reasonable and not prohibited by clearly established case law. Officer Lovato alternatively asserts that even if he is not entitled to qualified immunity, he is entitled to summary judgment "because Mr. Archuletta's choice to remain hidden rather than surrender after multiple warnings was an intervening cause of his injuries." (Defs.' Reply (Docket No. 46) at iii.)

UPD, in its defense, asserts that it is not liable under Section 1983 because Mr. Archuletta's constitutional rights were not violated. It further contends that even if Officer Lovato violated Mr. Archuletta's constitutional rights, Mr. Archuletta has not submitted evidence of any offending policy or evidence that the alleged policy (or purported failure to train) caused the alleged constitutional violation.

_____

[6]In addition to his Section 1983 municipal liability claim, Mr. Archuletta asserts a claim of respondeat superior against UPD. Political subdivisions of the state (such as UPD) are not liable under the doctrine of respondeat superior for actions of their employees, particularly in the case of alleged assault and battery. See Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (holding that local governments "are not vicariously liable under § 1983 for their employees' actions.") (citing Monell v. NYC Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)); Utah Code Ann. § 63G-7-301(5)(b) (retaining immunity from suit for injuries arising out of assault and battery). Accordingly, the court dismisses Mr. Archuletta's Section 1983 claim under the theory of respondeat superior.

For the reasons set forth below, the court finds that (1) Officer Lovato is entitled to qualified immunity because no constitutional violation occurred;[7] and (2) Defendant Unified Police Department is not liable under Section 1983 because (a) no constitutional violation occurred; and (b) Mr. Archuletta has not presented evidence of the existence of an offending policy or failure to train, much less causation.

**Qualified Immunity**

Qualified immunity "provides 'immunity from suit rather than a mere defense to liability.'" <u>Mecham v. Frazier</u>, 500 F.3d 1200, 1203 (10th Cir. 2007) (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)). The doctrine shields law enforcement officers from civil

---

[7]Officer Lovato contends that even if he is not entitled to qualified immunity, a finding of liability is still foreclosed because certain events superseded Officer Lovato's alleged tortious acts. (<u>See</u> Defs.' Reply at iii.) But the manner in which Officer Lovato is attempting to apply the superseding causation rule does not translate well in the circumstances here.

A superseding cause may relieve a defendant of liability under Section 1983. <u>Trask v. Franco</u>, 446 F.3d 1036, 1046 (10th Cir. 2006). But that rule only applies when another act intervenes <u>after</u> the officer's conduct has occurred and breaks the chain of causation. <u>Id.</u> That chain of causation (the reasonably foreseeable intervening events) is broken when there is an "unforeseen and abnormal intervention." <u>Warner v. Orange County Dep't of Probation</u>, 115 F.3d 1068, 1071 n.2 (2d Cir. 1997) (internal quotation marks and citations omitted). Nothing that occurred in this case fits into that category.

Officer Lovato maintains that "Mr. Archuletta's choice not to surrender, to hide with Maestas, and to remain hiding despite public announcements that a police dog would be sent in were superseding causes to his injuries." (Pl.'s Mem. Supp. Mot. Summ. J. at xi.) But those decisions and the corresponding actions are not intervening events, because they occurred <u>before</u> Officer Lovato arrived at the house.

Moreover, the act allegedly occurring <u>after</u> Officer Lovato sent Aldo into the crawl space—the movement of Mr. Archuletta—was reasonably foreseeable. A defendant in a Section 1983 suit is "responsible for the natural consequences of his actions." <u>Malley v. Briggs</u>, 475 U.S. 335, 344 n.7 (1986); <u>see also</u> <u>Warner</u>, 115 F.3d at 1072 (a § 1983 defendant is "liable for consequences caused by 'reasonably foreseeable intervening forces.'"). It is completely foreseeable that a person in hiding might move when approached by a police dog and that the dog would bite that person, as it was trained to do. For the reasons set forth above, Officer Lovato's causation analysis is not persuasive.

liability for discretionary actions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[8]

Generally, summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Officer Lovato raises the defense of qualified immunity, Mr. Archuletta, the non-movant, bears the burden of demonstrating that the law was clearly established at the time the conduct occurred and that evidence supports a finding that Officer Lovato violated that clearly established law. Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989); Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 645 (10th Cir. 1988). Only after Mr. Archuletta has satisfied his burden does Officer Lovato "assume the normal burden of a movant for summary judgment of establishing that no material facts remain in dispute that would defeat . . . his claim of qualified immunity." Powell, 891 F.2d at 1457. Regardless of burden shifting, the court must view the facts in a light most favorable to the non-moving party. See Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir. 2010); Buck v. City of Albuquerque, 549 F.3d 1269, 1279 (10th Cir. 2008).

**Claim of Illegal Entry**

Officer Lovato, who arrived at the scene ten to fifteen minutes after other officers had entered the house, was entitled to rely on the representations and acts of the officers. "[P]olice officers may ordinarily rely on determinations made by other officers regarding the constitutional

---

[8]The court may choose the order in which to analyze the "clearly established" and "constitutional violation" issues. Pearson v. Callahan, 555 U.S. 223 (2009).

legitimacy of police procedures." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1180 (10th Cir. 2003). So even if the underlying entry was unconstitutional, Officer Lovato's reasonable reliance entitles him to qualified immunity.

In Baptiste v. J.C. Penney Co., 147 F.3d 1252 (10th Cir. 1998), the Tenth Circuit addressed an officer's contention that she was entitled to qualified immunity because she reasonably relied on another officer's determination of probable cause to arrest when she conducted a pat-down search. Noting that the officer arrived at the scene after the suspect had been arrested, the court stated that "even if qualified immunity does not apply to the seminal event [i.e., the arrest and detention]," the officer who arrived at the scene after the arrest "is independently entitled to qualified immunity if her pat-down search did not violate [the plaintiff's] right to be free from a search absent a lawful arrest." Id. at 1260. The Tenth Circuit in Baptiste emphasized that "[p]olice work often requires officers to rely on the observations, statements, and conclusions of their fellow officers. An officer who is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect herself from personal liability." Id. See also Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.").

The situation here is similar to the one addressed in Baptiste. Officer Lovato was called to the scene after crucial events had occurred.

The officers who requested Officer Lovato's assistance had, at that time, already entered

the house. South Salt Lake police officers had already arrested Mr. Maestas and were attempting to determine whether another person was in the crawl space. When Officer Lovato arrived at the house, officers were already inside the house and in the yard. An officer in the yard told him he was needed inside. When he went inside the house, another officer directed him to the loft. When he arrived at the loft, the officers said they believed, although they were not sure, that another person associated with the rape suspect was hiding in the crawl space and that they needed Aldo's assistance to confirm their suspicions. The officers waiting for him in the loft conveyed their safety concerns. And it was apparent to Officer Lovato that, if an officer were to go into the crawl space without knowing what awaited, the officer would be in considerable danger.

None of the circumstances faced by Officer Lovato would have given him any reason to question the situation or his fellow officers' request. As he said during his deposition, "I relied on the officers on the scene, just based on what they were asking me to do, that they were going to continue to be in the house and that the attic needed to be cleared. And I was there to support them with my K9." (Lovato Dep. at 80-81.) He was not in a position to question the officers' presence in the house, nor should he be held liable for failing to do so.

For the foregoing reasons, the court finds that Officer Lovato had no reason to believe that he was in the house illegally. Accordingly, he is entitled to qualified immunity from Mr. Archuletta's illegal entry claim.

**Claim of Illegal Search**

Officer Lovato contends that he conducted a protective sweep when he sent Aldo into the crawl space. "A protective sweep is a cursory, limited search of a residence or other premises for

the sole purpose of securing officers' safety during an arrest or investigation."  Fishbein v. City

of Glenwood Springs, Colo., 469 F.3d 957, 961 (10th Cir. 2006).  Under this exception to the

warrant requirement,

> [p]olice are permitted to search a premises without judicial pre-authorization
> when they reasonably believe, on the basis of articulable facts, that they face an
> imminent threat to their personal safety or that the safety of third parties is
> imminently threatened.  *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093,
> 108 L. Ed. 2d 276 (1990).  Further, the search must not be motivated by an intent
> to arrest or seize evidence.  *Id.* at 326 ("Such a protective sweep is not a full
> search of the premises, but may extend only to a cursory inspection of spaces
> where a person may be found."); *see Roska v. Peterson*, 328 F.3d 1230, 1240
> (10th Cir. 2003) (holding that a search motivated by exigent circumstances is
> lawful only when not motivated by intent to arrest or seize evidence).

Fishbein, 469 F.3d at 961 (emphasis added).  The sweep should be "no longer than is necessary

to dispel the reasonable suspicion of danger."  Maryland v. Buie, 494 U.S. 325, 335-36 (1990).

To successfully rely on the protective sweep exception, Officer Lovato "must articulate

specific facts, 'which, taken together with the rational inferences from those facts, would warrant

a reasonably prudent officer in believing that the area to be swept harbors an individual posing a

danger to those on the arrest scene.' [*Maryland v. Buie*, 494 U.S. 325, 334 (1990).]"  Fishbein,

469 F.3d at 962 (internal citation omitted).  Officer Lovato has done so.

According to the record (as seen from the point of view of a reasonable officer arriving at

the scene after an entry and arrest have occurred), the officers found and arrested a rape suspect

in the house.  That suspect had been hiding in the attic crawl space.

Officer Lovato did not know the circumstances of the rape allegations, including whether

the alleged rape had just occurred and whether the house was the alleged crime scene.  Nothing

in the record contradicts the reasonable inference that the officers were there to investigate a

crime scene. In addition, the presence of multiple officers reasonably suggested to Officer Lovato that an investigation was about to begin or was ongoing, and so a sweep of the house to secure the space for the officers was necessary.

The officers expressed concerns to Officer Lovato that another person might be hiding in the attic, but they also expressed uncertainty. The officers had drawn their guns at the entrance to the crawl space, a signal that they were concerned for their safety. That visual signal, which would have been apparent to Officer Lovato or anyone else arriving on the scene at that moment, was confirmed by officers' expressions to Officer Lovato about their safety concerns. The officers specifically told Officer Lovato that they requested his assistance because they believed that the crawl space needed to be cleared and that they needed a dog, not an officer, to do it.

The fact that the officers told Officer Lovato that anyone they found in the attic would be charged with felony obstruction does not change the court's analysis. The record shows that the officers were not sure that the attic contained another person. They were surmising that any person hiding in the same space where the rape suspect had been found would have been harboring the suspect. This does not mean they were seeking to arrest Mr. Archuletta. They did not know whether anyone, much less a particular individual, was in the attic. And Officer Lovato had no reason to discount the officers' assessment of the scene. The search of the crawl space was not driven by the intent to extract and arrest a suspect who had been accused of felony obstruction. The officers, by calling Officer Lovato and his police dog to the scene, were motivated by a desire to clear the space.

Furthermore, the search was limited to the crawl space. The officers reasonably focused on that area because that is where the rape suspect, Mr. Maestas, had hidden.

And although at least ten to fifteen minutes passed before the search of the crawl space occurred, the passage of time is easily explained by the unique problem the crawl space presented and the need to wait for a patrol dog. There is no evidence that any other search was occurring in the house. And as soon as Officer Lovato and Aldo arrived, they swept the crawl space. Use of a police dog, and the unavoidable delay to wait for the dog to arrive, was "necessary to dispel the reasonable suspicion of danger." Maryland v. Buie, 494 U.S. 325, 335-36 (1990).

The officers were facing an unknown. If another person was hiding in the crawl space, it was reasonable to infer that the person was allied with the rape suspect. If that individual was armed and left alone, he could either shoot through the ceiling or walls or come out of hiding and ambush the officers. As in Fishbein v. City of Glenwood Springs, Colo., 469 F.3d 957 (10th Cir. 2006), Officer Lovato "relied on various bits of circumstantial evidence to inform [his] judgment that a hostile party might be present." Id. at 962 (describing the case as analogous to protective sweep cases "where an accomplice is lurking on the premises" and recognizing "that unaccounted-for third parties with access to firearms may present a grave danger to arresting officers"). The case of United States v. Soria, 959 F.2d 855 (10th Cir. 1992), is also instructive. In Soria, the appellate court affirmed the lower court's finding that a warrantless search was a protective sweep. There, the officers quickly searched an auto body shop associated with a suspect who had been arrested nearby. The court held that the officers reasonably believed that accomplices may have been hiding in the auto body shop and that they, if present, posed a danger to the officers investigating the drug trafficking crime. Id. at 857.

Officer Lovato was there to assist in a situation the other officers had already assessed was unsafe. He reasonably relied on the officers' representations and the uncertainty of the

situation.  The Tenth Circuit noted that its protective sweep case law "requires officers to have some articulable basis for their suspicion of danger – not certain knowledge."  Fishbein, 469 F.3d at 963.

For all of these reasons, the court concludes that Officer Lovato's search was not motivated by an intent to arrest or gather evidence and that he engaged in a legal protective sweep.

**Claim of Excessive Force**

The question of whether Officer Lovato, by releasing Aldo into the crawl space, used excessive force on Mr. Archuletta[9] is whether Officer Lovato's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 397 (1989), quoted in Thomson v. Salt Lake County, 584 F.3d 1304, 1313 (10th Cir. 2009).  "Reasonableness is evaluated under a totality of the circumstances approach, which requires that [the court] consider and balance the following factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arresting or attempting to evade arrest by flight.'"  Thomson, 584 F.3d at 1313 (quoting Graham, 490 U.S. at 396).  The court must determine the reasonableness of the use of force by looking at the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.

_____

[9]Mr. Archuletta filed an objection and motion to strike the declaration of Kenneth Wallentine, who opines on the reasonableness of Officer Lovato's use of Aldo.  (See Docket No. 35.)  The court does not need to consider Mr. Wallentine's declaration to make its decision, and so that motion is denied as moot.

To begin, to the extent Mr. Archuletta suggests that the use of Aldo was unreasonable deadly force (counsel for Mr. Archuletta asserted during the hearing that the case law is in conflict about whether use of a police dog is deadly force), the court disagrees.[10] Importantly, the Tenth Circuit has expressly declined "to deem a police dog's ability to bite and hold to be sufficient to make [the dog's] release, alone, an act of deadly force. To hold otherwise could result in nearly every release of a police dog being considered deadly force." Thomson v. Salt Lake County, 584 F.3d 1304, 1315 (10th Cir. 2009). "Deadly force is such force that 'create[s] a substantial risk of causing death or serious bodily harm.'" Id. at 1314. The "bite and hold" training of Aldo does not necessarily require a finding of a risk of serious bodily harm. "We see no need to deprive police officers of the benefit of these useful tools (i.e., police dogs) solely because they carry the potential to cause serious harm." Id. at 1316.

Mr. Archuletta does not point to any case where the use of a police dog in the fashion Aldo was used would rise to the level of deadly force. And he unsuccessfully attempts to inflate the danger allegedly posed by Aldo by contending, without supporting evidence, that Aldo was improperly trained. As in Thomson, 584 F.3d at 1316, such speculation does not support a finding that the release of a "bite and hold" dog was use of deadly force.

Looking at the three Graham factors and the circumstances facing Officer Lovato, the court concludes that the release of Aldo into the crawl space was not an excessive use of force.

---

[10]The standard of reasonableness is heightened when analyzing the propriety of using deadly force. "If a particular use of force is considered deadly force, then an officer's use of that force is reasonable only 'if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others.'" Thomson, 584 F.3d at 1314 (emphasis in original) (internal citations omitted).

Felony obstruction is not a violent crime (the court does not believe that the analysis should focus on the alleged rape, because Mr. Maestas was the only rape suspect and he was arrested before Officer Lovato arrived). That factor does not weigh strongly in Officer Lovato's favor. But, as discussed above, the officers' concerns were less about whether a person had obstructed the apprehension of a rape suspect and more about whether an unknown person, if he was indeed hiding in the crawl space, was armed and dangerous and posed a risk to the officers. It would be unreasonable to expect the officers, who had just arrested a rape suspect who was attempting to avoid arrest, to walk away with suspicions unresolved. And it would be unreasonable to expect Officer Lovato to second-guess the officers' safety assessment. He was summoned to do what he is trained to do.

The crawl space was dark, had blind corners, and was cramped. The officers had already found someone (the rape suspect) hiding there. If another person was hiding in the crawl space, that person was also attempting to evade the police. As Officer Lovato testified, there was no reasonable alternative to the use of Aldo to search the crawl space. Sending in an officer posed too much danger.

There is no evidence that Aldo would not do what he was trained to do, but if he did not follow his training at that particular moment, Officer Lovato could not have prevented it. Aldo was trained and certified and Officer Lovato had positive experience with the dog. There is nothing in the record to suggest that Aldo had strayed from his training before and so there was nothing to concern Officer Lovato. Given Aldo's unremarkable track record, a reasonable officer would have reasonably expected the dog to follow his training. Accordingly, the release of Aldo into the crawl space was reasonable under the circumstances.

**Claim of Municipal Liability**

"A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)). The plaintiff must also demonstrate that the municipality's action amounted to "deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989) (emphasis added), quoted in Myers, 151 F.3d at 1318; see also Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997) ("As our § 1983 municipal liability jurisprudence illustrates, . . . a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (emphasis added).

The court has already found that no constitutional right was violated. But even if Officer Lovato had violated Mr. Archuletta's constitutional rights, Mr. Archuletta does not provide any evidence that UPD improperly trained, much less failed to train, Officer Lovato or Aldo. Mr. Archuletta's assertions about the need to track dog-bite ratios, which are not supported by any expert witness testimony or facts, do not establish the existence of any offending policy that would have been a moving force behind any constitutional right violation.

For these reasons, the court finds that the Unified Police Department is not liable to Mr. Archuletta under Section 1983.

## ORDER

For the reasons set forth above, the court holds that Officer Lovato is entitled to qualified immunity on Mr. Archuletta's § 1983 claims of illegal entry, illegal search, and excessive force. The court also holds that the Unified Police Department is not liable under Section 1983 for the events that occurred on April 12, 2012. Accordingly, the Motion for Summary Judgment filed by Defendants Unified Police Department and Officer Luis Lovato (Docket No. 31) is GRANTED. In addition, because the court did not rely on the Declaration of Kenneth Wallentine to make its decision, the Plaintiffs' Motion to Strike that declaration (Docket No. 35) is DENIED AS MOOT.

The Clerk of Court is hereby directed to close this case.

SO ORDERED this 14th day of October, 2014.

BY THE COURT:

*Tena Campell*

TENA CAMPBELL
U.S. District Court Judge